UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| SHEILA HOWARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-2082 (PLF) |
| | ) | |
| DISTRICT OF COLUMBIA PUBLIC | ) | |
| SCHOOLS, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

OPINION

      This matter is before the Court on defendants' motion for summary judgment. Upon consideration of the motion, plaintiff's response in opposition, defendant's reply, plaintiff's sur-reply, defendant's response to the sur-reply, the parties' supplemental briefing in response to the Court's March 16, 2007 Order, and the entire record in the case, the Court denies defendants' motion for summary judgment.[1]

---

[1]      The relevant papers on this motion are Defendants' Motion for Summary Judgment ("Def. Mot."); Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Pl. Resp."); Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment ("Def. Reply"); Plaintiff's Sur-Reply in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Pl. Sur-Reply"); Defendants' Response to Plaintiff's Sur-Reply in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Def. Resp. Sur-Reply"); Plaintiff's Supplemental Briefing in Response to the Court's March 16, 2007 Order ("Pl. Supp. Br."); and Defendants' Supplemental Briefing in Response to the Court's March 16, 2007 Order ("Def. Supp. Br."), as well as the exhibits submitted with each of these filings, and the parties' respective Statements of Material Facts.

## I.  BACKGROUND

Plaintiff Sheila Howard, an African American female, was employed as a supervisory industrial hygienist by the Facilities Management and Capital Improvement Division of the District of Columbia Public Schools ("DCPS") Environmental, Safety, and Health Unit, beginning in July, 2000.  See Declaration of Sheila R. Howard ("Howard Dec.") ¶ 2. Plaintiff's duties included all aspects of health and safety involving DCPS facilities.  See Deposition Transcript of Sheila Howard ("Howard Dep. Tr."), Pl. Ex. A,  at 36:5-9.  Her primary responsibility was to manage the asbestos program, but she was also responsible for remedying other potential health and safety problems affecting air, soil, and water quality at DCPS sites.  Id. at 34-39.[2]  At all times relevant to this motion, Ricardo Eley was plaintiff's immediate supervisor.  See Deposition Transcript of Ricardo Eley ("Eley Dep. Tr."), Pl. Ex. 16 at 26-28. Plaintiff's second-level supervisor was Gregory Williams, the Deputy Director for Operations and Maintenance.  See Declaration of Gregory Williams ("Williams Dec."), Def. Ex. B ¶ 1.

Plaintiff's job performance was evaluated a year after she was hired.  See Howard Dec. ¶ 10.  She received an "Excellent" rating, and her evaluation included the following comment:  "Ms. Howard is a true professional" who "works diligently to the task at hand" and "has taken on enormous responsibility managing the Asbestos Program."  Id.[3]  The evaluation

---

[2]      Plaintiff had a staff of five inspectors and two administrative personnel. See Howard Dep. Tr. at 27:4-9.

[3]      An "Excellent" rating is the second highest rating that can be given. See Howard Dec., Ex. E, ¶ 10.

also stated, however, that "Ms. Howard needs to improve her organizational and computer skills."  Id.

       Approximately two months after she began working in her position as a supervisory industrial hygienist, plaintiff began "a running conversation" with Mr. Eley and Mr. Williams regarding her concerns about staffing and funding for her position.  See Howard Dep. Tr. at 78:18 -79:17.  Among her concerns were the experience level, education and background, caliber and work ethic of members of her staff.  Id.

       In May 2002, the Superintendent of DCPS announced a transformation of DCPS' central office, which included the Office of Facilities Management.  See Deposition Transcript of Patricia Lattimore ("Lattimore Dep. Tr."), Def. Ex. C, at 28:14 - 32:3.  As a result of the transformation, all positions within DCPS' central office, with few exceptions, were abolished. Id. at 16:6 – 17:6.  The employees in the abolished positions were terminated and were invited to re-apply, along with non-DCPS employees, for positions in the transformed central office.  Id. Plaintiff's position was one of the positions scheduled for abolition, and she received notice that her employment would be terminated, effective July 31, 2002.  See Howard Dep. Tr. at 94.[4]

       Prior to plaintiff's termination, the Human Resources Department at DCPS advertised a vacancy announcement for an industrial hygienist in the reorganized central office. Howard Dep. Tr. at 103-06.  Plaintiff did not apply for the position.  Id.[5]  Defendants claim that

---

[4]     Plaintiff concedes that her position was terminated as a result of the transformation of the central office, and nothing more.  See Howard Dep. Tr. at 103:10-17, 139:3-11.

[5]     If plaintiff had applied for this position, she automatically would have been eligible for the interview process, like any other terminated employee. See Def. Ex. C, Lattimore Dep. Tr. at 17:16-19.

plaintiff informed Mr. Williams that she did not apply for the position because she was no longer interested in being an industrial hygienist.  Id. at 104-05.  Plaintiff counters that she did not apply for the position because she felt it was under-funded and under-staffed.  See Howard Dec. ¶ 33.  In addition, she said she was interested in applying for other positions within DCPS.  Id.

Three candidates interviewed for the position on July 20, 2002.  See Def. Ex. B, Williams Dec. ¶ 3.  The interview panel consisted of three individuals, Mr. Williams, Mr. Eley, and James Jackson.  A DCPS Human Resources representative was also present at the interview. Id.  The panel members numerically scored the candidates' responses to a list of set questions. Id.[6]  After the interviews concluded, the panel members discussed the candidates and agreed that Kelley Clark, an African American female, should be selected for the position.  Id.  Ms. Clark was offered the position, but she declined to accept it for reasons unrelated to the job.  See Def. Ex. D, Declaration of Kelley Janine Clark ("Clark Dec.") ¶ 2.

After Ms. Clark declined to accept the position, the Human Resources Department re-advertised the vacancy on August 12, 2002 and, again, during the following two months.  See Def. Ex. E, Vacancy Announcements.[7]  Plaintiff responded to the August vacancy announcement.  See Howard Dep. Tr. at 105, 120.  Plaintiff claims that she decided to apply for her old position after she had a conversation with Mr. Eley during which he informed her that he would try to obtain more funding and better staffing for the position.  Id.  Plaintiff also asserts

---

[6]     Each candidate was asked to answer the same five questions and their responses were scored on a scale of one to four, for a maximum score of twenty.

[7]     Plaintiff claims that the position was advertised four times, the first time when she did not apply, and again on August 12, September 8, and October 13, 2002. See Pl. Resp. at 6-7; Complaint ¶¶ 6-8.

that she applied for the position because she "genuinely loved [the] position."  See Howard Dec.
¶ 33.

The DCPS Human Resources Department selected plaintiff and five other
applicants to interview for the position.  See Def. Ex. B, Williams Dec. ¶ 4.  This time, the
individuals on the interview panel were Mr. Williams, Mr. Eley and Craig Georg, a
representative from the United States Army Corps of Engineers.  See Eley Dep. Tr. at 29-30.[8]
Following the interviews, DCPS Human Resources tallied the interview scores and provided the
Director of Facilities Management, Sarah Woodhead, with a list of the six candidates in order of
their interview scores.  See Def. Ex. C, Lattimore Dep. Tr. at 87-90.  Candidate Jeffery Edwards
scored the highest, with an average score of eighteen (18).  Id.[9]  Plaintiff and another candidate,
Dr. Saheed Rahimi, a male of Iranian national origin, tied for the second highest score with
seventeen (17) each.  Id.[10]  Dr. Rahimi's interview was conducted by telephone.

---

[8]    A representative from the DCPS Human Resources Department also was present during
the interviews.  See Def. Mot. at 5.

[9]    Mr. Edwards subsequently was eliminated from consideration for the position after he
was arrested, charged and convicted of attempted bribery and extortion of money from a federal
agent.  See Howard Dec., Ex. K, Criminal Docket for Case No. 1:03-cr-00156.

[10]   Mr. Williams gave plaintiff a score of 17 and Dr. Rahimi a score of 13; Mr. Eley gave
both plaintiff and Dr. Rahimi 18; Mr. Georg gave plaintiff 16 and Dr. Rahimi 20.  See Pl. Resp.
at 8-10.  Plaintiff asserts that Dr. Rahimi remained in competition for the position "only because
Mr. Georg . . . inexplicably gave Dr. Rahimi a perfect and higher score than he gave Ms.
Howard, despite the fact that he could not 'recall' Rahimi's interview responses 'being better
than Ms. Howards' and having had a very good impression of Mr. [sic] Howard from working
with her."  Pl. Resp. at 12-13, quoting Transcript of Craig Georg Deposition ("Georg Dep. Tr.")
at 56, 59-61.

Defendants contend that Ms. Woodhead, as the selecting official, had full discretion in determining who to select for the position. Def. Mot. at 5.[11] She could have selected anyone on the list, regardless of the interview scores. Def. Ex. C, Lattimore Dep. Tr. at 95-97.  She also could have re-interviewed the candidates, re-advertised the position, or chosen not to fill the position.

Defendants assert that in this instance, Ms. Woodhead sought the recommendation of Mr. Williams because, as the Deputy Director for Operations and Maintenance, Mr. Williams oversaw the position of industrial hygienist.  See Def. Ex. F, Declaration of Sarah Woodhead ("Woodhead Dec.") ¶ 2.  Mr. Williams recommended that Ms. Woodhead select Dr. Rahimi for the position. Id.; see Def. Ex. B, Williams Dec. ¶ 5.  Mr. Williams based his recommendation on Dr. Rahimi's background, including the fact that he had a Ph.D., as well as his enthusiasm for the position.  Id. ¶ 6.  In addition, Mr. Williams did not believe that plaintiff was really interested in the position because she had not applied for the position during the first vacancy announcement and because she continued to express her discontent at the lack of funding and staff for the position.  Id.[12]  Accordingly, Mr. Williams sent Ms. Woodhead a memorandum, dated October 23, 2002, on which he wrote "Sarah [Woodhead]: [Dr. Rahimi] is the choice of Ric [Eley] & I."  In his deposition, however, Mr. Eley testified that

---

[11]     Plaintiff counters that "Mr. Eley sat on ten panels during the transformation reorganization . . . [h]e does not remember an instance during the transformation reorganization where upper level management made a decision different from a panel's recommendation, other than in the selection of Rahimi." Pl. Resp. at 11 quoting Eley Dep. Tr. at 65-66.

[12]     During her interview, plaintiff discussed the quality of her former staff, reiterating the same concerns she had raised previously with her supervisors.  See Howard Dep. Tr. at 137:19 - 139:7.

he did not recommend that Dr. Rahimi be selected for the position (Eley Dep. Tr. at 75) and testified that he was surprised when he learned that Ms. Woodhead had decided to select Dr. Rahimi. Id. at 47.  Plaintiff asserts that the October 23, 2002 Williams memorandum was fabricated after the fact in order to help justify Ms. Woodhead's decision to hire Dr. Rahimi. See Pl. Resp. at 17-18.

    Ms. Woodhead claims that she decided that Dr. Rahimi was the better candidate based primarily on his education and work experience.  See Def. Ex F, Woodhead Dec. ¶ 3. Dr. Rahimi has a doctorate in chemistry, while Ms. Howard has a bachelor of arts degree in biology/pre-med.  Id. ¶ 4.[13]  Both applicants had received training in industrial hygiene, but, Ms. Woodhead asserts, Dr. Rahimi's training was more extensive and more relevant to the position. Id.  Ms. Woodhead also asserts that Dr. Rahimi's work experience in the field of industrial hygiene was broader and entailed greater responsibility than did plaintiff's work experience.  Id. ¶ 5.[14]  Plaintiff's work experience focused primarily on basic regulatory compliance related to asbestos and lead.  Id.  Ms. Woodhead concedes that asbestos and lead were important to DCPS, but contends that there were other industrial hygiene issues in the school system at the time.  Id. Dr. Rahimi's work experience also included the development and management of specific programs in a broad variety of environmental health areas, including asbestos and lead, indoor air quality, and chemical management issues.  See Def. Ex. F1, Rahimi Application.  Finally,

---

[13] Plaintiff asserts that Dr. Rahimi's Ph.D. is actually in Soils Engineering and is unrelated to the primary duties of the industrial hygienist position. See Howard Dec. ¶ 21.

[14] Dr. Rahimi had been employed in the field of industrial hygiene since 1984. See Woodhead Dec. ¶ 5; Def. Ex. F1, Rahimi Application. Defendants assert that plaintiff's work in the field of industrial hygiene did not begin until 1991; plaintiff asserts that she started working in the field in 1989. See Def. Ex. F2, Plaintiff's Application; Howard Dec. ¶ 4.

Ms. Woodhead asserts that Dr. Rahimi's written application was more "comprehensive, detailed and complete" than plaintiff's application.  Woodhead Dec. ¶ 6.

Plaintiff counters that she has greater in-depth knowledge of and experience with the federal EPA/OSHA/DC health and safety regulations, especially those concerning asbestos and lead based paint.  Howard Dec. ¶ 22.  In addition, plaintiff points out that she has participated in several health and safety forums and has been involved in local policy development, technical reports, asbestos remediation, emergency spill responses, hazardous waste management/storage and removal, air quality assurance programs, and the review of industrial hygiene equipment and materials in use at DCPS facilities.  Id. ¶ 24.

Plaintiff filed charges of discrimination over her non-selection by DCPS with the District of Columbia Office of Human Rights and the U.S. Equal Employment Opportunity Commission ("EEOC").  See Pl. Resp. at 11.  She alleged discrimination on the basis of race, sex and color.[15]  The EEOC investigated plaintiff's complaint and, on May 5, 2004, issued a determination finding that there is reason to believe that violations of Title VII occurred in the selection process.  Id.; see Amended Complaint ("Amend. Comp.") ¶ 2.[16]  On September 21,

---

[15]     Although not defined in the statute, Title VII claims based on color have been interpreted by the courts as relating to the complexion of one's skin.  See Arrocha v. City Univ. of New York, 2004 WL 594981, at *6 (E.D.N.Y. 2004) ("although plaintiff characterizes his claim as one for racial discrimination, discrimination based upon skin coloration is a more accurate description of the claim since it alleges that light-skinned Hispanics were favored over dark-skinned Hispanics"); Felix v. Marquez, 1980 WL 242, at *1 (D.D.C. 1980) ("Color may be a rare claim, because color is usually mixed with or subordinated to claims of race discrimination, but considering the mixtures of races and ancestral national origins in Puerto Rico, color may be the most practical claim to present.").  As plaintiff does not make any arguments based on complexion of her skin color, but rather argues race discrimination because she is African American or black, the Court does not address this color claim separately.

[16]     The EEOC issued an amended determination on May 27, 2004.  See Amend. Comp. ¶ 39.

2004, the EEOC closed plaintiff's EEOC file and issued her a Notice of Right to Sue within 90 days.  See Amend. Comp. ¶ 40.  On December 1, 2004, plaintiff filed the present action with this Court.[17]

## II.  STANDARD OF REVIEW

### A.  Summary Judgment Standard

Summary judgment may be granted only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits [or declarations], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; Holcomb v. Powell, 433 F.3d at 895.  When a motion for summary judgment is under consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006), cert. denied, 127 S. Ct. 1140 (2007); Aka v. Washington Hosp. Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en

---

[17]     Plaintiff filed an Amended Complaint on December 22, 2004.

banc); Washington Post Co. v. Dep't of Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir.

1989).  On a motion for summary judgment, the Court must "eschew making credibility

determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir.

2007).

        The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  She is required to

provide evidence that would permit a reasonable jury to find in her favor.  Laningham v. U.S.

Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the non-movant's evidence is "merely

colorable" or "not significantly probative," summary judgment may be granted.  Anderson v.

Liberty Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 127 S. Ct. 1769, 1776 (2007)

("where the record taken as a whole could not lead a rational trier of fact to find for the non-

moving party, there is 'no genuine issue for trial.'") (quoting Matsushita Elec. Industrial Co. v.

Zenith Radio Corp., 475 U.S. 574 (1986)).  To defeat a motion for summary judgment, a plaintiff

must have more than "a scintilla of evidence to support [her] claims."  Freedman v. MCI

Telecomm. Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).  In an employment discrimination case,

"[u]sually, proffering evidence from which a jury could find that the employer's stated reasons

were pretextual will be enough to get a plaintiff's claim to a jury."  George Leavitt, 407 F.3d

405, 413 (D.C. Cir. 2006) (citing Carpenter v. Fed. Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C.

Cir. 1999) (internal quotations omitted).

III.  DISCUSSION

Title VII provides, in relevant part, that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In the absence of direct evidence of discrimination, disparate treatment claims under Title VII are analyzed under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under this framework, a plaintiff must first establish, by a preponderance of the evidence, a "prima facie case" of discrimination.  Mastro v. Potomac Elec. Power Co., 447 F.3d at 850; Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1149 (D.C. Cir.2004).  The burden of establishing a *prima facie* case is not an onerous one.  Id. (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

In order to establish a *prima facie* case in a Title VII case involving a failure to hire, a plaintiff must show:  (i) that she belongs to a protected class; (ii) that she applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite her qualifications, she was rejected; and (iv) that after her rejection, the position remained open and the employer continued to seek applicants from persons of plaintiff's qualifications.  McDonnell Douglas Corp. v. Green, 411 U.S. at 802; see Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1149-50; Stella v. Mineta, 284 F.3d 135, 144 (D.D. Cir. 2002).[18]  McDonnell Douglas

---

[18]     The Supreme Court has emphasized that the McDonnell Douglas model of the *prima facie* case is not intended to be rigid and thus its requirements can vary depending upon the factual content. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). With this in mind, the court of appeals in Stella v. Mineta articulated an alternative formulation of the Title VII *prima facie* case, pursuant to which a plaintiff must establish that "(1) she is a member of the protected

principally demands "that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job application:  an absolute or relative lack of qualifications or the absence of a vacancy in the job sought."  Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1150 (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n. 44 (1977)); see also Stella v. Mineta, 284 F.3d at 145.  "[E]limination of these reasons for the refusal to hire is sufficient, absent other explanation, to create an inference that the decision was a discriminatory one."  Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1151 (quoting Int'l Bhd. of Teamsters, 431 U.S. at 358 n. 44); see Stella v. Mineta, 284 F.3d at 145.

DCPS argues that plaintiff failed to establish a *prima facie* case.  The Court disagrees.  Plaintiff, an African American, is a member of a protected class.  She has shown that there was a position available and that she was qualified for it.  See, e.g., Howard Dec., ¶ ¶ 3-11; Woodhead Dep. Tr. at 44:11-12 ("[Plaintiff] was clearly qualified for the job.").  Despite her qualifications, she was rejected for the position and someone else was selected.  In demonstrating these facts, plaintiff has met the minimum standard required to establish a *prima facie* case of discrimination.

DCPS claims that no inference of discrimination can arise in this particular case because the applicant whom it initially selected for the position, Kelley Janine Clark, was an African American female, the same race and gender as plaintiff.  See Def. Mot. at 8.  This

---

class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  Stella v. Mineta, 284 F.3d at 145 (quoting Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir.1999)).  Nevertheless, the four-part formulation of McDonnell Douglas "remains the standard in typical failure-to-hire cases."  Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1150.

argument is not persuasive because it is established in this Circuit that a Title VII plaintiff is not required to show that she was disadvantaged in favor of a person outside her protected class in order to establish a *prima facie* case of discrimination.  See Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006) ("we impose no requirement that the employer filled the sought-after position with a person outside the plaintiff's protected class"); Mastro v. Potomac Elec. Power Co., 447 F.3d at 851 ("we have expressly rejected as immaterial a requirement that the plaintiff be replaced by an individual outside her protected class"); Stella v. Mineta, 284 F.3d at 145-46 (prima facie case is "not extinguished" if position filled by a person outside her protected class).  Thus, in order to establish a *prima facie* case, it is not necessary for an African American plaintiff to show that she was disadvantaged by the employer's hiring of a Caucasian or other non-African American applicant.  To impose such a requirement would be to graft an additional element onto the McDonnell Douglas model that the D.C. Circuit has concluded the Supreme Court did not intend.[19]

Plaintiff having established a *prima facie* case of discrimination, the burden shifts to DCPS  to produce admissible evidence that, if believed, would demonstrate that its decision not to hire plaintiff was motivated by a legitimate, nondiscriminatory reason.  See Holcomb v.

---

[19]     This is not to say that the fact that DCPS initially offered the industrial hygienist position to a member of plaintiff's same protected class is entirely irrelevant. This fact might be relevant in assessing the merit's of plaintiff's case, but it is not a factor in the establishment of her *prima facie* case.  See Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1150.  For instance, in Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005), the court noted that a *prima facie* case could theoretically exist in such a situation, but held that "a replacement within the same protected class cuts strongly against any inference of discrimination."  See also Pyne v. District of Columbia, 468 F. Supp. 2d 14, 21 (D.D.C. 2006) (stating that African American plaintiff's case was severely undermined by the fact that the defendant filled two of the three positions for which plaintiff applied with African Americans).

Powell, 433 F.3d at 901; Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1151. DCPS' burden is

solely one of production, not persuasion.  Id.  If a defendant rebuts the presumption of

discrimination by offering a legitimate, non-discriminatory reason for its action, "the

presumption of discrimination 'simply drops out of the picture,' and 'the sole remaining issue [i]s

discrimination *vel non*.'"  Mastro v. Potomac Elec. Power Co., 447 F.3d at 854 (quoting

Holcomb v. Powell, 433 F.3d at 896 and Reeves v. Sanderson Plumbing Prods., 530 U.S. 133,

142 (2000) (other internal citations omitted)).  At that point, the Court must assess "whether a

reasonable jury could infer intentional discrimination' from the plaintiff's *prima facie* case and

any other evidence the plaintiff offers to show that the actions were discriminatory or that the

non-discriminatory justification was pretextual."  Smith v. District of Columbia, 430 F.3d 450,

455 (D.C. Cir. 2005) (quoting Murray v. Gilmore, 406 F.3d at 713); see also Mastro v. Potomac

Elec. Power Co., 447 F.3d at 854 (at this point, to survive summary judgment, plaintiff must

show that "a reasonable jury could conclude from all of the evidence that the adverse

employment decision was made for a discriminatory reason") (quoting  Holcomb v. Powell, 433

F.3d at 896).

        In attempting to show a legitimate nondiscriminatory reason for its hiring

decision, DCPS asserts that its selecting official, Sarah Woodhead, believed that Dr. Rahimi

was a better qualified candidate for the position because he has a "superior" educational

background and "greater" work experience.  See Def. Mot. at 11.  As noted, Dr. Rahimi holds a

doctorate in chemistry, while plaintiff only has a bachelor of arts degree in biology. Ms.

Woodhead also felt that Dr. Rahimi's work experience in the field of industrial hygiene is

"longer, broader, and with greater responsibility" than plaintiff's.  See Woodhead Dec. at ¶ 5.

His experience involved a variety of environmental health topics, including asbestos, lead, indoor air quality, and chemical management.  Id.  Ms. Woodhead believed that plaintiff's experience was more narrowly focused on basic regulatory compliance, primarily related to asbestos and lead.  Id.  Dr. Rahimi also had greater responsibility in developing and managing environmental health programs, while plaintiff had only been a manager of such a program for the two years that she held the industrial hygienist position with DCPS. Id.; Ex. F1, Rahimi Application; Ex. F2, Pl. Application.

In addition to relying upon Dr. Rahimi's education and work background, Ms. Woodhead sought the advice of Gregory Williams, plaintiff's former supervisor.  See Williams Dec. ¶ 6.  Mr. Williams informed Ms. Woodhead that he was concerned that plaintiff was not really interested in the position.  Id.  Mr. Williams said he believed this for two reasons: (1) plaintiff did not apply for the position when it was first advertised after the reorganization, and (2) while employed as the industrial hygienist, plaintiff "continually expressed her dismay with the lack of funding and qualified staffing for the position." Id.  Plaintiff acknowledges that she had a running conversation in this regard with Mr. Williams and her direct supervisor, Mr. Eley, and raised the same concerns during her interview for the position in October 2002.  See Howard Dep. Tr. at 78:18-79:17, 137:19-139:7.

The Court finds that DCPS has offered a legitimate, nondiscriminatory explanation for not hiring plaintiff.  A comparison of Dr. Rahimi's and plaintiff's applications reveals that Dr. Rahimi possessed a higher educational degree than plaintiff and that his work experience was longer and broader than plaintiff's experience.  These facts alone may constitute legitimate, non-discriminatory reasons for selecting one candidate over another.  See, e.g.,

Mackey v. Shalala, 360 F.3d 463, 468 (4th Cir.), cert. denied, 543 U.S. 876 (2004) (holding that

disparity in educational backgrounds was a legitimate, nondiscriminatory basis for selection);

Aka v. Washington Hosp. Ctr., 156 F.3d at 1297 (holding that applicant's master's degree is a

legitimate consideration in selection process).  At the very least, this is the sort of "judgement

call" to which employers are entitled in assessing the relative qualifications of the candidates.

Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996)

(courts must respect the employer's unfettered discretion to choose among qualified candidates);

Waterhouse v. Dist. of Columbia, 124 F. Supp.2d 1, 7-8 (D.D.C. 2000), aff'd, 298 F.3d 989

(D.C. Cir. 2002) (it is the perception of the employer that is relevant, not plaintiff's own

subjective evaluation of her qualifications).  In addition, plaintiff's supervisor informed Ms.

Woodhead that he was concerned about plaintiff's commitment to the position, clearly a factor

that would weigh in any employer's hiring decision.

   Defendants having provided  legitimate, nondiscriminatory reasons for their

hiring decision, the burden returns to the plaintiff to prove by a preponderance of the evidence

that the legitimate reasons offered by DCPS were not its true reasons, but were a mere pretext

for discrimination.  Teneyck v. Omni Shoreham Hotel, 365 F.3d at 1151.  The ultimate question

on summary judgment is whether intentional discrimination could be inferred from all the

evidence presented to the trier of fact or, stated another way, whether there are genuine disputes

of material fact from which a reasonable jury could find that the employer's stated reasons were

pretextual.  See George v. Leavitt, 407 F.3d at 413.  Such evidence may include:  "(1) evidence

establishing the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the

employer's proffered explanations for its actions; and (3) any further evidence of discrimination

16

that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).  Vickers v. Powell, ___ F.3d ___, 2007 WL 1952369 (D.C. Cir. July 6, 2007); Mastro v. Potomac Elec. Power Co., 447 F.3d at 854; Dunaway v. Int'l Bhd. Of Teamsters, 310 F.3d 758, 763 (D.C. Cir. 2002); see also Czekalski v. Peters, 475 F.3d at 366.

Plaintiff focuses most of her argument on Ms. Woodhead's decision-making process. Ms. Woodhead claims that she made her hiring decision based on her review of the written applications, the recommendation of the interview panel, and Mr. Williams' recommendation.  Plaintiff contends that Ms. Woodhead's asserted decision-making process was fabricated after the fact to hide her truly discriminatory reasons for not hiring plaintiff.  See Pl. Resp. at 17-18.  For instance, plaintiff points out, Mr. Eley, one of the panel members, testified during his deposition that he did not recommend that Dr. Rahimi be hired:

> Q:  Did you ever give the opinion, at the conclusion of the interviews, to Mr. Williams that Dr. Rahimi was the best suited candidate for the industrial hygienist position?
>
> A:  No, Sir.
>
> Q:  You're sure of that?
>
> A:  One hundred percent sure.  Never.

Eley Dep. Tr. at 75.  Mr. Eley also stated that he was surprised to hear that Dr. Rahimi had been selected for the position:

> Q:  Were you surprised that [Dr. Rahimi] was selected instead of Ms. Howard?
>
> A:  I was.
>
> Q:  Why?

> A:    I just didn't get a warm and fuzzy talking to him over the phone.  I didn't. I know he had a good educational background.  He rated fairly well, but I just would rather have had a face to face [interview].
>
>                             \*    \*    \*
>
> Q:    Is it fair to say that, as a result of the interviews, you had a better opinion of Ms. Howard?
>
> A:    Than Dr. Rahimi?
>
> Q:    Yes.
>
> A:    I would say so.

Id. at 47-48.  Mr. Eley also stated that this was the only instance during the reorganization process that he heard of "upper management" making a different hiring decision than what the panel had recommended.  Id. at 66.

In addition, plaintiff claims that the October 23, 2002 memorandum in which Mr. Williams allegedly wrote "[Dr. Rahimi] is the choice of Ric [Eley] & I" was fabricated after the fact in order to justify Ms. Woodhead's decision to hire Dr. Rahimi.  Plaintiff points out that Mr. Williams rated Dr. Rahimi "below average" after his interview (Williams Dep. Tr. at 141) and that he could not recall giving Ms. Woodhead a reason for selecting Dr. Rahimi over plaintiff. Id. at 128-30.  By contrast, Mr. Williams gave plaintiff a seventeen out of twenty possible points for her interview score, as compared to the thirteen points he gave to Dr. Rahimi.  See Howard Dec., Ex. B.[20]

---

[20]    Plaintiff also claims that it was the addition of the "inflated" interview score of Craig Georg, the third panelist, that kept Dr. Rahimi "in the running" for the position.  Pl. Resp. at 24 n. 8.  Mr. Georg gave plaintiff his lowest interview score.  See Howard Dec., Ex. B.  Mr. Georg is employed by the United States Army Corps of Engineers.  Plaintiff's former supervisor, Dreck

Plaintiff also points to the fact that she successfully performed the duties of a industrial hygienist for DCPS for two years immediately prior to her interview.  During that time her supervisors described her as "exemplary," "excellent" and a "true professional."  <u>See</u> Pl. Resp. at 27; Wilson Dep. Tr. at 17, 28; Eley Dep. Tr. at 26-28.  Plaintiff claims that Ms. Woodhead's attempt to "justify passing over [plaintiff], who had performed exceptionally well as the incumbent, in favor of an untried, outside candidate" is simply not credible.  Pl. Resp. at 28.

The Court finds that plaintiff has proffered sufficient evidence to show that there are genuine issues of material fact with respect to whether DCPS' articulated reasons are a pretext for unlawful discrimination.  Plaintiff has met her burden at this stage by producing evidence that undermines Ms. Woodhead's articulated reasons for selecting Dr. Rahimi and contradicts the sworn testimony of Mr. Williams and Mr. Eley.  On the record now before the Court, there are a sufficient number of genuine factual disputes that are appropriately resolved by a jury, not by the Court.  Only a jury can properly assess the credibility of Ms. Howard, Ms. Woodhead, Mr. Eley and Mr. Williams, among others.  The Court simply cannot resolve plaintiff's claim on the basis of the conflicting evidence that leaves so many genuine issues of material fact to be resolved.

---

S. Wilson, noted at his deposition that the Army Corps of Engineers "was a formidable force within DCPS because [it] had a huge contract with DCPS to help manage [its] construction operations."  Deposition Transcript of Dreck S. Wilson ("Wilson Dep. Tr.") at 31.  According to Mr. Wilson, this created racial friction because the "Corps of Engineers was a predominately white organization," while DCPS was largely African American.  <u>Id</u>. at 33-34.  It is Mr. Wilson's belief that Mr. Georg held some of the same racist attitudes exhibited generally at the Corps.  <u>Id</u>. at 36-37.

IV.  CONCLUSION

Based on the foregoing analysis, the Court denies defendant's motion for summary judgement.  An Order consistent with this Opinion will issue this same day.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:   August 17, 2007